HOOD, Judge.
This is a workmen’s compensation suit instituted by Celestan Fontenot against his employer, Ramey Well Service, Inc., and its insurer, The Travelers Insurance Company. Judgment was rendered by the trial court in favor of the defendants, and plaintiff has appealed.
The principal questions presented are: (1) Has plaintiff been disabled as the re- *354 suit of a work-connected accident which occurred on March 3, 1964? and (2) Is plaintiff entitled to compensation benefits under the provisions of LSA-R.S. 23:1221 (4) (p) on the ground that the usefulness of a physical function has been impaired?
The accident which gave rise to this suit occurred on March 3, 1964. At that time, plaintiff was 39 years of age, and he was working as a roughneck for defendant, Ra-mey Well Service, Inc. He had worked principally as a roughneck in oil fields for about thirteen years prior to that date.
Plaintiff testified that he has been disabled from performing the work of a roughneck since the date of the accident. His symptoms have changed somewhat from time to time, but he testified that at the time of the trial, which occurred about nineteen months after the accident, he was disabled because of pain in his right shoulder, right arm and right hand, and pain and numbness over an area extending from the sternum around the right side of his chest, to a point near his spine.
The evidence shows that at about 1:30 p.m. on March 3, 1964, while plaintiff was using a pipe wrench in the course of his employment, the wrench broke and a part of it struck him in the chest, knocking him to the ground and causing him to lose consciousness momentarily. Pie resumed working a few minutes later, and he« continued to work the rest of that day and during all of the next five days. On March 9, he consulted his family physician, Dr. R. E. Landreneau, a general surgeon, who concluded that as a result of the accident plaintiff sustained injuries consisting of contused ribs, a bruised left forearm and a very mild intercostal neuritis. He also found that plaintiff had a pre-existing peptic ulcer, which at that time was causing nausea and severe epigastric pain, and he hospitalized plaintiff for three days for treatment of the ulcer and his injuries. There was no relationship, of course, between the above described accident and plaintiff’s ulcer. The doctor released plaintiff from treatment on March 12, as being able to return to his full employment on the next day.
Plaintiff resumed work as a roughneck on March 17 and 18, 1964, but he returned to Dr. Landreneau on March 21, complaining that he experienced pain in his chest when he strained. An intercostal nerve block was administered and this relieved the chest pain, but plaintiff thereafter complained of pain in his stomach, and the doctor felt that his ulcer was still bothering him. On April 1, 1964, the doctor concluded that plaintiff had recovered from all of his complaints, and he again discharged him as being able to return to his employment. Fontenot has never returned to work as a roughneck since that time, but he has worked as a carpenter’s helper, a pa'inter, a taxi driver and as a clean-up man in a service station.
Fontenot returned to Dr. Landreneau about four months later, on August S, 1964, complaining that he had lost some strength in his right arm, which hampered him in his carpentry and painting work. Dr. Lan-dreneau found subjective symptoms which he thought might indicate an intercostal neuritis, and he referred plaintiff to Dr. Joseph M. Edelman, and later to Dr. John D. Jackson, both of whom are neurosurgeons, for' examination. These specialists reported that they found no objective signs of injury or disability. Dr. Landreneau nevertheless made other examinations and concluded that plaintiff had an intercostal neuritis, with “an awful lot of psychological overlay,” and he performed a “neurectomy” on plaintiff on November 3, 1964, severing three nerves in the chest area. Good results were obtained from the operation, but within a month thereafter plaintiff began complaining of pain in different areas, including pain in the low back, pain in his neck and gastric disturbances.
Dr. Landreneau continued to treat plaintiff until January 20, 196S, but on that date he finally discharged him, stating that *355 Fontenot had “completely recovered and could resume heavy work,” except that he could not work as a roughneck in an oil field. Because of his inability to do that type work, he estimated that plaintiff has a ten percent permanent disability. In describing plaintiff’s condition at that time, Dr. Landreneau stated that he could use a sledge hammer, drive 'a truck, work with a shovel, handle an air hammer, and do almost any other kind of hard manual labor, but he felt that plaintiff would not be able to do the work of a roughneck which required that he lift heavy timber and pipe and carry these heavy objects against his chest. He stated that when he finally discharged plaintiff there was no impairment of any function, that there was no loss of muscle tone and that plaintiff had “no more pain and no more complaints referable to this area.” He bases his estimate of disability on the fact that “if he’d have to be in a place where he could be struck again by a heavy chain or be hit by pipes that were swinging back and forth on the oil rig, I think he could begin to traumatize his chest to make the other intercostal nerves hurt again.”
Dr. Edelman, one of the neurosurgeons to whom plaintiff was referred by Dr. Landreneau, examined Fontenot on September 1, 1964, and on February 5, 1965. He could find no basis for any of plaintiff’s complaints and was firm in his opinion that plaintiff was fully able to perform heavy manual labor. He stated, “I mean he’s an able-bodied man. I can’t see why there’s any kind of work he couldn’t do.”
Dr. Jackson, the other neurosurgeon already mentioned, examined plaintiff on September 10, 1964, and stated that, “This patient presents an objectively normal neurological examination and the x-ray examination is within normal limits.” He thought there may be some psychological factor perpetuating plaintiff’s complaints of pain, and because of that he recommended that plaintiff be treated “with encouragement and tranquilizers and advise him to attempt to return to work.” He also suggested, however, that “if Dr. Landre-neau could localize this pain to one specific nerve, then he might consider it worthwhile to perform a removal of the intercostal nerve that is involved.”
Shortly after being discharged for the second time by Dr. Landreneau, plaintiff consulted Dr. Roderick P. Perron, a general practitioner in Mamou, who examined him on April 3, 1964. Dr. Perron found no objective signs of injury, but based on plaintiff’s subjective complainfs he concluded that he had sustained “an’ injury to the right anterior chest wall which had produced some myitis secondary to the trauma.” He felt that within three to six weeks plaintiff should be able to return to work without any pain whatsoever. Dr. Perron later referred plaintiff to Dr. Norman P. Morin and to Dr. Luke R. Borde-lon, orthopedic surgeons, for further examinations.
Dr. Morin examined Fontenot on June 9, 1964, and Dr. Bordelon examined him on July 16, 1964, and on February 12, 1965. Both of these orthopedic surgeons testified that they were unable to find any evidence of injury or disability, and they found no explanation of plaintiff’s ’ continued complaints of pain. They felt that plaintiff had fully recovered from any injury which he may have sustained, and that he was able to perform heavy manual labor at the times they saw him.
Dr. Thomas L. Rafferty, a psychiatrist, examined plaintiff in July or August, 1965, and made the diagnosis that plaintiff did not have a conversion reaction or psychiatric illness of any kind, that he was a “malingerer,” that he was “consciortsly simulating” his complaints, and that he was not disabled.
Dr. Davidson H. Texada, Jr., a neuro-psychiatrist, examined plaintiff on April 7, 1965, and concluded that he had a functional or hysterical type of disturbance which *356 he characterized as a conversion reaction of a moderate degree. He felt that plaintiff could not return to work as a roughneck in an oil field, although he could perform other types of heavy manual labor. Plaintiff’s principal complaints to Dr. Tex-ada were of pain radiating into the shoulder and arm, with numbness of the arm.
We think it is significant to note here that plaintiff was involved in an automobile accident about two weeks before Dr. Texada examined him, that he claimed to have sustained an injury in that accident and that he was wearing a neck brace at the time of that examination. Dr. Texada felt that the injuries which he sustained in that automobile accident were “definitely an aggravating factor,” that plaintiff “was doing better until he had this automobile accident,” and that “he may have gone along to a good recovery if he hadn’t been involved in this accident.” He stated that “at least within the near future, I thought this man could have returned to his previous work as a roughneck or what-not if he hadn’t had this aggravation of symptoms that followed the automobile accident.”
We think it also is significant that plaintiff informed Dr. Texada that he had had no previous accidents or injuries, and the doctor accepted that statement in making his diagnosis. As we will show later, plaintiff had sustained prior accidental injuries and the history which he gave to Dr. Texada was incorrect, at least insofar as it related to his prior injuries.
The records show, and plaintiff concedes, that he sustained the following injuries before the date of the accident which gave rise to this suit: (1) About twenty years ago, while building a board runway, he sustained a broken cartilage of the knee, disabling him from work for six or eight weeks, for which injury he received a compensation settlement of $900; (2) About 1957 he mashed his right foot, but he missed no time from work and he received no compensation payments; (3) During or about 1960, he broke his left foot and was off work about two months, for which injury he received a settlement of between $800 and $900; (4) In 1962 he sustained an injury to his low back area, disabling him for about a year and a half, for which injury he received $6500 in settlement of his compensation claim, in addition to the medical expenses and compensation which had been paid to him for about eleven months prior to the settlement; and (5) On November 4, 1963, he sustained an injury while working as a roughneck and was off work eight or nine weeks. He testified in this proceeding that he injured his hip on that occasion, but in the compensation suit which he filed following that accident he alleged that he had injured his “neck, shoulders, back and left arm.” He later settled his claim by accepting $750, in addition to the medical expenses and compensation which previously had been paid. The settlement for this last mentioned injury was effected on January 21, 1964, about six or seven weeks before the accident involved here occurred. He apparently began working for Eamey Well Service shortly after that settlement was effected.
As we have already pointed out, plaintiff also sustained an injury to his neck in March, 1965, when a large truck collided with the rear of a taxi cab he was driving. He obtained medical treatment for his neck injury which included the wearing of a neck brace.
Plaintiff relies largely upon the testimony of Dr. Landreneau and of Dr. Texada in claiming that he has either a physical disability or a conversion reaction. Although Dr. Landreneau was the treating physician, we are impressed by the fact that he discharged plaintiff three times as being able to return to heavy manual labor, the first time being three days after plaintiff first consulted him. We understand from the doctor’s testimony that when plaintiff was finally discharged, he had no further pain, disability or weakness of any kind. We cannot agree with Dr. Landreneau that *357 Fontenot is disabled from performing the work of a roughneck simply because he may be struck by a heavy chain or by drill pipes and thus sustain another injury. The doctor did not say, and there is no basis for a finding, that because of this accident and injury, plaintiff is now more prone to sustain another accident and injury while working as a roughneck than he was before March 3, 1964. As we have already pointed out, Dr. Texada’s testimony has been rendered somewhat less forceful by the fact that plaintiff misrepresented to him his history of prior injuries, and also by the fact that plaintiff had sustained another injury shortly before the doctor saw him, The other medical evidence, including the testimony of two orthopedic surgeons, two neurosurgeons and a psychiatrist, is convincing to the effect that plaintiff has not been disabled.
The trial judge concluded that plaintiff had not been disabled as a result of the accident which occurred on March 3, 1964. We think the evidence supports that conclusion, and we thus affirm that finding of the trial court.
Plaintiff, however, claims compensation benefits under LSA-R.S. 23:1221(4) (p) because he contends that the usefulness of a physical function has been seriously and permanently impaired. He points out that as a result of the neurectomy which was performed, there is an area of numbness or anesthesia about six inches wide, extending from the sternum around the right side of his chest to a point about two or three inches from his spine. He says he can feel it if someone touches him in that area, but he is insensitive to pin pricks and to temperature.
LSA-R.S. 23:1221(4) (p) provides that in cases not falling within other provisions of the Workmen’s Compensation Act, the court may allow compensation “where the usefulness of a physical function is seriously permanently impaired.” Under this provision compensation has been allowed for such things as loss of hearing, loss of the sense of smell and loss of teeth. Ryan v. Aetna Casualty and Surety Company, 161 So.2d 286 (La.App. 2 Cir., 1964); Holmes v. Traders and General Insurance Company, 94 So.2d 537 (La.App. 2 Cir., 1959) ; and Daigle v. Blasingame, 162 So. 2d 351 (La.App. 3 Cir., 1964). In all of those instances, of course, the loss was permanent and was serious. Plaintiff contends that his loss of the “function of touch and temperature” is a loss of function similar to that of hearing and smell, and thus he is entitled to compensation benefits.
The evidence in the instant suit shows that a neurectomy was performed on plaintiff for the specific purpose of anesthetizing a portion of his chest wall, and that the purpose of that operation was accomplished. The numbness which he experiences does not inconvenience or interfere with any activity which he may want to pursue, its only effect being that he will be insensitive to pin pricks, burns or pain in the affected area.
Under the facts presented here, we think the trial judge correctly held that plaintiff is not entitled to compensation benefits on the ground that the usefulness of a physical function is “seriously” and “permanently” impaired.
For the reasons herein assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.
On Application for Rehearing.
En Banc. Rehearing denied.